# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 19-565

BAYOU BRIDGE PIPELINE, LLC

VERSUS

38.00 ACRES, MORE OR LESS, LOCATED

IN ST. MARTIN PARISH, ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 87011
HONORABLE KEITH RAYNE JULES COMEAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JONATHAN W. PERRY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Billy Howard Ezell, Shannon J. Gremillion, D. Kent Savoie, and Jonathan W. Perry, Judges.

Ezell, J., dissents in part and assigns reasons.

**AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED FOR DETERMINATION OF ATTORNEY FEES, EXPERT WITNESS FEES, AND COURT COSTS.**

William Patrick Quigley
Loyola University College of Law
7214 St. Charles Ave.
New Orleans, LA 70118
(504) 710-3074
COUNSEL FOR DEFENDANTS/APPELLANTS:
    Peter Aaslestad
    Theda Larson Wright
    Katherine Aaslestad

Pamela C. Spees
Astha Sharma Pokharel
Center for Constitutional Rights
666 Broadway, 7th Flr
New York, NY 10012
(212) 614-6431
COUNSEL FOR DEFENDANTS/APPELLANTS:
    Peter Aaslestad
    Katherine Aaslestad
    Theda Larson Wright

Misha L. Mitchell
411 Walnut Street #15255
Green Cove Springs, FL 32043
(225) 692-1133
COUNSEL FOR DEFENDANTS/APPELLANTS:
    Peter Aaslestad
    Theda Larson Wright
    Katherine Aaslestad

Michael Beatty Donald
Jones Walker, LLP
811 Main Street, Ste. 2900
Houston, TX 77002
(713) 437-1824
COUNSEL FOR PLAINTIFF/APPELLEE:
    Bayou Bridge Pipeline, LLC

Ian Alexander Macdonald
Jones Walker, LLP
600 Jefferson Street, Suite 1600
Lafayette, LA 70501
(337) 593-7612
COUNSEL FOR PLAINTIFF/APPELLEE:
    Bayou Bridge Pipeline, LLC

**Archie Paul Joseph**
**P. O. Box 1283**
**Breaux Bridge, LA 70517**
**(337) 332-5287**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **Barry Scott Carline, et al.**

**Jeff Landry**
**Attorney General of Louisiana**
**Harry J. Vorhoff**
**Ryan M. Seidemann**
**Assistant Attorney General**
**P. O. Box 94005**
**Baton Rouge, LA 70804-9005**
**(225) 326-6085**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **State of Louisiana**

**PERRY, Judge.**

Katherine Aaslestad, Peter Aaslestad, and Theda Larson Wright (hereinafter collectively referred to as "Defendants") appeal the decision of the trial court denying their exception of prematurity, granting expropriation in favor of Bayou Bridge Pipeline, LLC[1] (hereinafter "BBP"), and denying their reconventional demand in which they sought damages for violations of their due process rights. For the following reasons, we hereby affirm the decision of the trial court, in part, reverse, in part, and remand to the trial court for determination of costs.

## FACTS AND PROCEDURAL HISTORY

This matter centers on the construction of the Bayou Bridge Pipeline, a 162.5-mile crude oil pipeline running from the Clifton Ridge terminal in Lake Charles, Louisiana to a marketing hub in St. James, Louisiana; this is an extension of the pipeline Energy Transfer had previously built from Nederland, Texas to Lake Charles. After obtaining several federal and state environmental permits and certifications,[2] BBP began to acquire servitudes[3] needed to build the pipeline, including the roughly thirty-eight acres that is the subject of this current litigation. BBP identified approximately 470 heirs to the title of the parcel, including Defendants. Nevertheless, prior to reaching servitude agreements with all individuals BBP recognized as having an ownership interest, BBP authorized

---

[1] BBP is a joint venture formed between Energy Transfer Partners (hereinafter "Energy Transfer"), which merged with Sunoco Logistics Partners, and Phillips 66 Partners, LP.

[2] BBP obtained Section 404 and 408 permits from the U.S. Corps of Engineers, a Coastal Use Permit from the Louisiana Department of Natural Resources Office of Coastal Management, a Water Quality Certification from the Louisiana Department of Environmental Quality, and a permit from the Bayou Lafourche Fresh Water District.

[3] The servitudes consisted of a permanent right of way, as well as temporary rights of way, including a temporary access road and temporary workspace.

construction to begin in early 2018. During the summer of 2018, BBP entered Defendants' property, cleared trees, dug trenches, and began construction of the pipeline even though it lacked legal authority to do so. Thus, on July 27, 2018, prior to BBP's initiation of expropriation litigation, Peter Aaslestad, one of the Defendants, brought suit to enjoin BBP from illegally continuing its construction on the not-yet expropriated property. As a result of this injunction proceeding, BBP entered into a stipulated agreement in September 2018, to remain off the property as of September 10, 2018; however, by then pipeline construction was more than ninety percent complete.

On July 27, 2018, just after Peter Aaslestad filed his suit for injunctive relief, BBP initiated the expropriation litigation against those property owners with whom agreements could not be reached, such as Defendants, or who could not be located;[4] BBP's petition for expropriation identifies 393 individuals made defendant.[5] Defendants' answer to the expropriation included an affirmative defense alleging the Louisiana expropriation system was unconstitutional as it applied to oil pipelines, such as BBP. Further included in their answer were exceptions of prematurity, alleging BBP failed to properly provide two of Defendants with information required by La.R.S. 19:2.2. Defendants further filed a reconventional demand seeking damages for trespass, alleging BBP had illegally entered their property, as well as

_____

[4] Later, on September 20, 2018, BBP filed a second petition for expropriation naming approximately 115 additional defendants involved in this same 38-acre tract. The trial court consolidated these two matters for trial.

[5] There were three groups of defendants: (A) located defendants (90 individuals); (B) deceased defendants with unopened successions (53); and (C) absentee defendants (250 individuals). Also made defendants were "any other persons claiming an interest in the property who Bayou Bridge has not been able to identify or locate."

2

damages for BBP's violations of due process prior to obtaining a judgment of expropriation.

The trial court dismissed the exceptions, finding sufficient service and a lack of prejudice to Defendants. In a hearing prior to trial of the expropriation action, the trial court further held that the eminent domain scheme established by the Louisiana Constitution adequately protected the due process and property rights of Louisiana landowners under both the State and Federal Constitutions. After a trial on the merits, the trial court ruled that the expropriation of land for a servitude to lay the pipeline served a public and necessary purpose and granted expropriation. Finally, the trial court found that, although BBP was entitled to a servitude to lay the pipeline, it had entered onto and disturbed Defendants' property prior to the time it had acquired the right to do so. As compensation for BBP's expropriation of this servitude to lay the pipeline, the trial court awarded each of the Defendants $75.00. The trial court also determined that for BBP's trespass of approximately five months, each of the Defendants was entitled to an additional $75.00 for trespass damages. The trial court's judgment contains no separate award for BBP's violation of Defendants' due process rights when BBP conducted months-long construction on the property prior to obtaining an order of expropriation.

On appeal, Defendants assert four assignments of error. They claim that the trial court erred in: (1) denying their affirmative defenses, asserting that Louisiana's granting of eminent domain to private oil pipeline companies violates U.S. and Louisiana Constitutions' due process and property rights protections;[6] (2) failing to render judgment on certain aspects of their reconventional demands alleging

---

[6] Defendants do not appeal the trial court's award of compensation for the expropriation of the land. Thus, that aspect of the judgment is final.

3

violations of their property and due process rights, despite the trial court finding BBP trespassed on their property; (3) denying their dilatory exceptions of prematurity, where BBP allegedly failed to comply with statutory prerequisites for expropriation; and (4) allowing impermissible evidence of economic development and incidental benefit to the public in determining whether the expropriation served a public and necessary purpose.

## APPELLATE PRACTICE

From the outset, we note that an issue has arisen about whether this court should address the trial court's trespass damage award even though the Defendants failed to raise that issue as an assignment of error. For that reason, we will first address the need for appellate assignments of error in civil litigation and exceptions thereto.

### Assignments of Error; an overview

Louisiana Code of Civil Procedure Article 2129 states:

> An assignment of errors is not necessary in any appeal. Where the appellant designates only portions of the record as the record on appeal, he must serve with his designation a concise statement of the points on which he intends to rely, and the appeal shall be limited to those points.

Elaborating on La.Code Civ.P. art. 2129, the Official Revision Comment states:

> The jurisprudence has construed Arts. 896 and 897, Code of Practice of 1870, to the effect that where the transcript is certified as containing all the testimony and the grounds for reversal are apparent from the face of the record, no assignment of errors is necessary. *Bossier v. Caradine,* 18 La.Ann. 261 (1866); *In re Fazende,* 35 La.Ann. 1145 (1883); *Havana American Co. v. Board of Assessors,* 105 La. 471, 29 So. 938 (1901).

4

In *Mayo v. Nissan Motor Corp. in U.S.A.,* 93-852  (La.App. 3 Cir. 6/22/94),

639 So.2d 773, 792,*writ granted and remanded*, 94-1978, 94-1990 (La. 11/1/94), 644

So.2d 661, Judge Culpepper (dissenting, in part) observed:

> Code of Practice of 1970, Art. 896 provided that if the copy of the record brought up from the trial court was not certified by the clerk of the lower court as containing all of the testimony adduced, the supreme court would only judge the case on a statement of facts. Article 897 provided that an appellant who did not rely wholly or in part on a statement of facts, an exception to the judge's opinion, or a special verdict, but on an error of law appearing on the face of the record, would be allowed a period of ten days after the record was brought up to file a statement specifically alleging any errors. The Official Revision Comment under LSA–C.C.P. Art. 2129 indicates the jurisprudence under the old Code of Practice Articles construed them to mean that where the transcript is certified as containing all of the testimony and the grounds for reversal are apparent from the face of the record, no assignment of errors was necessary. This jurisprudence was simply codified in LSA–C.C.P. Art. 2129.

Moreover, La.Code Civ.P. art. 2164 and the Official Revision Comments thereunder

state:

> The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal.  The court may award damages for frivolous appeal; and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable.

> **Official Revision Comments**

> (a) The purpose of this article is to give the appellate court complete freedom to do justice on the record irrespective of whether a particular legal point or theory was made, argued, or passed on by the court below.  This article insures that the "theory of a case" doctrine, which has served to introduce the worst features of the common law writ system into Louisiana is not applicable to appeals under this Code. See Hubert, The Theory of a Case in Louisiana, 24 Tul.L.Rev. 66 (1949).

Nevertheless, Uniform Rules--Courts of Appeal, Rule 1–3 reads as follows:

> The scope of review in all cases within the appellate and supervisory jurisdiction of the Courts of Appeal shall be as provided by LSA–Const. Art. 5, § 10(B), and as otherwise provided by law. The

> Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise.

Commenting further in his partial dissent in *Mayo* 639 So.2d at 792–93, a dissent that later persuaded the supreme court to remand the matter to the appellate court, Judge Culpepper stated:

> In the general discussion of assignments of error, 5 Am.Jur.2d 99–116, Appeal and Error, Sec. 648, it is stated that the purpose of assignments of error is to advise the appellate court and the appellee of the errors by the trial court complained of, so that discussion may be limited. Some jurisdictions have a "strict rule" requiring an assignment of error as mandatory for appellate review. Other jurisdictions have a "liberal rule" allowing appellate review even though the assignment of error is inadequate or entirely lacking. In courts which have a liberal rule, the absence or insufficiency of an assignment of error is not jurisdictional and will not be cause to reject an issue unless the failure has prejudiced the appellee in some way.
>
> . . . .
>
> It is obvious that Louisiana follows the "liberal rule". LSA–C.C.P. Art. 2129 quoted above, expressly provides an assignment of error is not necessary in any appeal, unless only a portion of the record has been designated for appeal. LSA–C.C.P. Art. 2164 allows the appellate court to render any judgment which is just, legal and proper upon the record on appeal, regardless of assignments of error. The only possible basis for excluding our review of the third party demand in the present case is Rule 1–3 of the Uniform Rules of the Courts of Appeal, and even that rule expressly provides that if the interest of justice requires it, the court of appeal should consider an issue as to which there was no assignment of error.

*"Interest of justice" exception*

The jurisprudence addressing the scope of the "interest of justice" exception referenced in La.Code Civ.P. art 2164 is scant. *Lonzo v. Lonzo*, 17-0549 (La.App. 4 Cir. 11/15/17), 231 So.3d 957. The fourth circuit then elaborated in *Lonzo*, 231 So.3d at 963, n. 8 (emphasis added):

> *See Maurello v. Dep't of Health & Human Res., Office of Mgmt. & Fin.,* 510 So.2d 458, 460 (La. App. 1st Cir. 1987) (finding the exception applied "[b]ecause of the importance of assuring that Ms.

6

Maurello's **fundamental constitutional due process rights** are met"); *Gauthier v. Harmony Const., LLC*, 13-269, pp. 8-9 (La. App. 5 Cir. 10/9/13), 128 So.3d 314, 319 (finding the "interest of justice" exception applied because the argument raised **"jurisdictional concerns"**); *Delo Reyes v. Liberty Mut. Fire Ins. Co.*, 08-0769, p. 5 (La. App. 4 Cir. 2/18/09), 9 So.3d 890, 893 (finding it was in the "interest of justice" to allow review of the issue of "whether the trial judge's *ex parte* **communications** were in error" despite the appellants' failure to object on the record); *Davis v. Recreation Dep't*, 12-1273, p. 8 (La. App. 4 Cir. 1/30/13), 107 So.3d 1254, 1259 (applying the exception).

Summarizing the principles applied by federal courts in addressing a similar issue, the federal Fifth Circuit in *French v. Estelle*, 696 F.2d 318, 319–20 (5th Cir. 1982), stated:

> It is well established that an appellate court is not precluded from considering an issue not properly raised below in a civil proceeding, if manifest injustice would otherwise result. In *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Supreme Court stated that a federal appellate court would certainly be justified in resolving an issue that was not passed on below "where the proper resolution [was] beyond any doubt ... or where 'injustice might otherwise result.' " 428 U.S. at 121, 96 S.Ct. at 2877 (citations omitted). In *Empire Life Insurance Co. v. Valdak Corp.*, 468 F.2d 330, 334 (5th Cir. 1972), we held that "it is well established that as a matter of discretion, an appellate court could pass upon issues not pressed before it or raised below where the ends of justice will best be served by doing so," and that this court has a "duty to apply the correct law." (citations omitted) (emphasis in original). *See also Thorton v. Schweiker*, 663 F.2d 1312, 1315 (5th Cir. 1981) (rule that court will not consider issue not raised below on appeal is not inflexible and gives way to prevent a miscarriage of justice); *Weingart v. Allen & O'Hara, Inc.*, 654 F.2d 1096, 1101 (5th Cir. 1981) (rule that appellate court will consider only errors of which appellant specifically complains is not inflexible); *Martinez v. Mathews*, 544 F.2d 1233, 1237 (5th Cir. 1976) (rule requiring issues to be raised below "can give way when a pure question of law is involved and a refusal to consider it would result in a miscarriage of justice").

Some specific applications of this exception are the following: a remand to allow the introduction of new evidence to prevent a miscarriage of justice, *Jackson v. Wal-Mart Properties, Inc.,* 443 So.2d 3, 4 (La.App. 3 Cir. 1983); "the trial court's

refusal to grant a new trial in light of the facts disclosed by this record has produced a miscarriage of justice. The case must be remanded for the purpose of allowing defendant to present her defense to plaintiff's change of custody rule," *Bearden v. Bearden*, 393 So.2d 859, 861 (La. App. 2 Cir. 1981); "[g]iven the lifetime impact this litigation will have upon the parties involved, particularly the minor child, G.J.K, we find, in the interest of justice and judicial economy, that K.A. should be allowed the opportunity to amend his petition and appropriately challenge the constitutionality of La. C.C. art. 198 in the trial court," *Kinnett v. Kinnett*, 17-625 (La. App. 5 Cir. 3/23/18), 243 So.3d 745, 748; finding that the trial court "arbitrarily exercised the discretion vested in him by law in refusing to reopen the case or to grant a new trial, which was manifestly in the interest of justice," *Succession of Robinson*, 186 La. 389, 397–98, 172 So. 429, 431–32 (1936); finding a lower court's manifest error cannot serve to defeat appellant's right to have his evidence considered when there has not been a proffer and the District Court has refused to consider it without giving any reason therefore, compelled the appellate court, in the interest of justice, to remand the case to permit introduction of this evidence, *Tauzier v. Tauzier*, 405 So.2d 1309, 1311 (La.App. 4 Cir. 1981); "[b]ecause of the importance of assuring that Ms. Maurello's fundamental constitutional due process rights are met, we will entertain her challenge of the termination procedure used by DHHR," *Maurello v. Dep't of Health & Human Res., Office of Mgmt. & Fin.*, 510 So.2d 458, 460 (La. App.1 Cir.), *writ denied*, 514 So.2d 460 (La.1987).

In the present case, our review of the record shows that the Defendants urged the trial court to award damages for BBP's trespass. After reviewing the facts and the jurisprudence at a trial on the merits, the trial court awarded trespass damages of $75.00 to each of the Appellants. Although the Defendants assign as error the trial

court's failure to compensate them for BBP's violation of their due process rights regardless of any other injury they may have suffered, in their assignments of error the Defendants do not raise the adequacy of the $75.00 trespass damage award, and their brief never argues that the $75.00 award should be increased. The question then arises whether we should nonetheless address the adequacy of the trespass damage award in the "interest of justice."

After considering this question, we find that the "interest of justice" exception is not without limitation. As the jurisprudence points out, that exception has been applied in various limited circumstances, for example: (a) when fundamental constitutional due process is involved; (b) when a jurisdictional concern is implicated; (c) when a trial judge may have had improper ex parte communication; (d) where the proper resolution of an issue is beyond a doubt or where injustice might occur; (e) when an incorrect law has been applied; and (f) when a pure question of law is involved and the failure to consider it would result in the miscarriage of justice. Utilizing those as guideposts, we do not find that the adequacy of the quantum award, one that was purely discretionary with the trial court, falls within the parameters of the "interest of justice" exception.[7] Accordingly, we do not find the adequacy of the trespass damage award is before us.[8]

---

[7] Should we have decided to reach the adequacy of the trespass award, based upon *Thompson v. Winn-Dixie Montgomery, Inc.*, 15-0477 (La. 10/14/15), 181 So.3d 656, we would have been required to give the parties notice of our *sua sponte* determination to provide them with an opportunity to be heard on the issue; failure to have done so would have been legal error. *See also Rombach v. State ex rel. Div. of Admin.*, 15-0619 (La. App. 1 Cir. 12/23/15)*, writ not considered sub nom. Rombach v. State ex rel. Div. of Admin., Office of Risk Mgmt.*, 16-00214 (La. 4/4/16), 190 So.3d 1200 (holding that based upon *Thompson* and not wishing to commit legal error, the appellate court "directed the parties to show cause why the issue of whether plaintiff has stated a cause of action should not be addressed *sua sponte*" because this had not been an assignment of error).

[8] Unlike the issue of trespass damages, we nonetheless find that in their assignments of error the Defendants do raise the issue that the trial court erred when it failed to award damages for BBP's violation of their property and due process rights.

# CONSTITUTIONAL ISSUES

We first address Defendants' claims regarding the constitutionality of the Louisiana expropriation system. Defendants contend that by ceding expropriation power to a private oil pipeline company, Louisiana's eminent domain law abuses due process under both the United States and Louisiana Constitutions. Defendants issue a facial challenge to La.R.S. 19:2, La.R.S. 45:251, and La.Const. art. 1, § 4(B)(4).

A facial challenge is an attack on a statute itself as opposed to a particular application. *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 135 S. Ct. 2443 (2015). A facial challenge to a legislative act "is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [a]ct would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100 (1987).

> An elementary principle of statutory construction in constitutional law holds that all statutory enactments are presumed to be constitutional. *Interstate Oil Pipe Line Co. v. Guilbeau*, 217 La. 160, 46 So.2d 113 (1950); *State on behalf of J.A.V.*, 558 So.2d 214 (La.1990). Unless the fundamental rights or privileges and immunities of a person are involved, a strong presumption exists that the legislature in adopting legislation has acted within its constitutional authority. *Board of Directors of Louisiana Recovery Dist. v. All Taxpayers, Property Owners, etc.*, 529 So.2d 384 (La.1988).

*Polk v. Edwards*, 626 So.2d 1128, 1132 (La.1993). The strength of this constitutional challenge is the central question we must decide in reviewing this case. We will first address Defendants' claims concerning the U.S. Constitution.

---

10

*The United States Constitution*

United States Constitution Amendment V provides that no person shall be "deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." The Defendants' arguments concerning the alleged constitutional violation relies mainly on the private nondelegation doctrine, "a nook of Fourteenth Amendment law long recognized but seldom invoked." *Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701, 703 (5th Cir. 2017). Defendants claim that the Louisiana expropriation scheme provides oil pipeline companies with an unrestrained ability to restrict Louisiana landowner property rights. We disagree.

The right to expropriate is given to private owners and operators of pipelines as a common carrier of petroleum, petroleum products and petroleum by-products pursuant to La.R.S. 19:2(8)[9] and La.R.S. 45:251.[10] Expropriation of private property

_____

[9] Louisiana.Revised Statutes 19.2(8) provides:

Expropriation by state or certain corporations and limited liability companies

Where a price cannot be agreed upon with the owner, any of the following may expropriate needed property:
. . . .
(8) All persons included in the definition of common carrier pipelines as set forth in R.S. 45:251[.]

[10] Louisiana.Revised Statutes 45:251, provides:

As used in this Chapter, the following terms have the meaning ascribed to them in this Section, unless the context clearly indicates otherwise:

(1) "Common carrier" includes all persons engaged in the transportation of petroleum as public utilities and common carriers for hire; or which on proper showing may be legally held a common carrier from the nature of the business conducted, or from the manner in which such business is carried on.

(2) "Petroleum" means crude petroleum, crude petroleum products, distillate, condensate, liquefied petroleum gas, any hydrocarbon in a liquid state, any product in a liquid state which is derived in whole or in part from any hydrocarbon, and any

11

for a public purpose is authorized under La.Const. art. 1, § 4, which provides, in pertinent part (emphasis added):

Section 4. (A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.

(B)(1) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Except as specifically authorized by Article VI, Section 21 of this Constitution property shall not be taken or damaged by the state or its political subdivisions: (a) for predominant use by any private person or entity; or (b) for transfer of ownership to any private person or entity.
(2) As used in Subparagraph (1) of this Paragraph and in Article VI, Section 23 of this Constitution, "public purpose" shall be limited to the following:

(a) A general public right to a definite use of the property.

(b) Continuous public ownership of property dedicated to one or more of the following objectives and uses:

(i) Public buildings in which publicly funded services are administered, rendered, or provided.

(ii) Roads, bridges, waterways, access to public waters and lands, and other public transportation, access, and navigational systems available to the general public.

(iii) Drainage, flood control, levees, coastal and navigational protection and reclamation for the benefit of the public generally.

(iv) Parks, convention centers, museums, historical buildings and recreational facilities generally open to the public.

---

mixture or mixtures thereof; provided, however, that such term shall not include methanol synthetically produced from coal, lignite, or petroleum coke.

(3) "Pipe line" includes the real estate, rights of way, pipe in line, telephone and telegraph lines or other communication systems, tank facilities as herein designated, and necessary for the proper conduct of its business as a common carrier, all fixtures, equipment and personal property of every kind owned, controlled, operated, used or managed, in connection with, or to facilitate the transportation, distribution and delivery of petroleum through lines constructed of pipe.

(v) *Public utilities for the benefit of the public generally.*

(vi) Public ports and public airports to facilitate the transport of goods or persons in domestic or international commerce.

(c) The removal of a threat to public health or safety caused by the existing use or disuse of the property.

(3) Neither economic development, enhancement of tax revenue, or any incidental benefit to the public shall be considered in determining whether the taking or damaging of property is for a public purpose pursuant to Subparagraph (1) of this Paragraph or Article VI, Section 23 of this Constitution.

(4) *Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question.*

As previously noted, BBP is a common carrier pipeline company as defined in La.R.S. 45:251. "All pipe lines through which petroleum is conveyed from one point in this state to another point in the state are declared to be common carriers as defined in R.S. 45:251 and are placed under the control of and subject to regulation by the Louisiana Public Service Commission." La.R.S. 45:252. Thus, La.R.S. 45:254 grants BBP the authority to expropriate private property under specific circumstances. Louisiana Revised Statutes 45:254 provides, in pertinent part:

All persons included in the definition of common carrier pipe lines as set forth in R.S. 45:251 have the right of expropriation with authority to expropriate private property under the state expropriation laws for use in its common carrier pipe line business, and have the right to lay, maintain and operate pipe lines, together with telegraph and telephone lines necessary and incident to the operation of these pipe lines, over private property thus expropriated, and have the further right to lay, maintain and operate pipe lines along, across, over and under any navigable stream or public highway, street, bridge or other public place, and also have the authority, under the right of expropriation herein conferred, to cross railroads, street railways, and other common carrier pipe lines by expropriating property necessary for the crossing under the expropriation laws of this state.

Thus, La.Const. art. 1, § 4, La.R.S. 19:2(8), and La.R.S. 45:254 grant BBP the power to expropriate private property for a public and necessary purpose.

Defendants cite *Boerschig*, 872 F.3d 701, for the proposition that under the private nondelegation doctrine, "a legislative body may not constitutionally delegate to private parties the power to determine the nature of rights to property in which other individuals have a property interest, without supplying standards to guide the private parties' discretion." While we agree with Defendants that *Boerschig* is relevant to this matter, we find that it stands in stark contrast to their arguments here.

Under the Texas law challenged in *Boerschig*, an expropriation proceeding begins with a state district court appointing special commissioners who assess the value of the property. *See City of Tyler v. Beck*, 196 S.W.3d 784 (Tex. 2006). After the commissioners award the value of the property, but *prior to judicial review*, the expropriating authority can take control of the property. TEX. PROP. CODE § 21.021(a). If objections to the commissioners' award are filed, only then is a case opened in state court. *Tyler*, 196 S.W.3d at 784. It is during that judicial phase when the landowner may challenge the expropriating authority's finding of a public necessity. *See Anderson v. Teco Pipeline Co.*, 985 S.W.2d 559 (Texas Ct. App.— San Antonio, 1998).

In *Boerschig*, the landowner asserted that Texas's eminent domain regime violated the Due Process Clause, not only because of its broad delegation of power to private entities, but also because it failed to provide for a *predeprivation* hearing. We note that Louisiana's expropriation scheme allows for a judicial determination of whether the purpose of the taking is "public and necessary" *prior* to the taking,

14

rather than review of a taking after the fact,[11] as in the Texas statutes above. La.Const. art. 1, § 4.

The U.S. Fifth Circuit ultimately upheld the Texas law at issue, finding it did not run afoul of the private nondelegation doctrine, as "[i]t impose[d] a standard to guide the pipeline companies—that the taking is necessary for 'public use'—and provides judicial review of that determination that prevents the company from having the final say." *Boerschig*, 872 F.3d at 708. "The existence of a standard like the one Texas has for exercising eminent domain has prevented courts from finding that a delegation to private parties involves the unfettered discretion that violates due process." *Id.* Those standards coupled with judicial review, even after-the-fact judicial review as deferential as existed under Texas law in that matter,[12] were enough to prevent the Texas expropriation laws from violating the Fifth Amendment.

When we apply *Boerschig* to Louisiana's expropriation scheme it shows that Louisiana law, like the Texas law there, does not run afoul of the U.S. Fifth and Fourteenth Amendments, as it sets out appropriate standards to guide expropriating authorities and the courts, as well as providing for judicial review. Those standards are clearly set out in La.Const. art. 1, § 4, which requires that any taking be for a public and necessary purpose. Additionally, the standards set out by La.Const. art. 1, § 4 closely mirror the "public use" standard upheld in *Boerschig*. Furthermore, in addition to the standards delineated in the Louisiana Constitution, La.R.S. 19:2--9:16 provide notice requirements and set forth substantive and procedural rights

---

[11] That BBP entered the property prior to having a judicial determination, a fact it admits, becomes pertinent later in this opinion as we address the Defendants' due process claim.

[12] As discussed in *Boerschig*, 872 F.3d at 708–09 (quoting *Anderson*, 985 S.W.2d at 565), the Texas "state court does not determine 'public use' or 'necessity' as an original matter, but only reviews the pipeline's decision for either 'fraud, bad faith, abuse of discretion, or arbitrary or capricious action'" during the judicial review phase, after the taking of the property.

designed to substantially protect landowners' rights and to further ensure due process prior to a taking.

These standards combined with judicial review, as provided for by La.Const. art. 1, § 4, prevent BBP from having the unrestrained ability to restrict citizen's property rights and prevent this court from finding that the delegation to private parties under Louisiana expropriation law involves "unfettered discretion that violates due process." *Boerschig,* 872 F.3d at 708. *See also Gen. Elec. Co. v. New York State Dep't of Labor*, 936 F.2d 1448, 1455 (2d Cir. 1991).

The judicial review of expropriation is further cemented by La.R.S. 19:8, which lays the framework for the process of judicial review of a challenged expropriation and additionally serves to protect a landowner's right to challenge expropriation. "[T]he ability of the property owners to receive a judicial adjudication of the right to condemn private property through a collateral proceeding sufficiently protects their interest in the property sought to be condemned." *Joiner*, 380 F.Supp. 754, 772 (N.D. Tex. 1974), *aff'd sub nom. Joiner v. City of Dallas, Texas*, 419 U.S. 1042, 95 S. Ct. 614 (1974). In fact, as Louisiana law provides for judicial review to determine if a taking is for a public and necessary purpose *prior* to a taking, it provides more protection for landowners than the Texas's "quick take" system upheld in *Boerschig*.

Accordingly, we find the Louisiana expropriation system for oil pipelines does not violate the U.S. Constitution, as Defendants are afforded due process of law as well as just compensation.

### The Louisiana Constitution

We now turn to Defendants' assertion that the Louisiana eminent domain scheme violates rights to property and due process guaranteed in the Louisiana Constitution.

Rather than running contrary to the Louisiana Constitution, it is the Constitution itself that grants private entities authority to expropriate for public and necessary purposes, with just compensation, and subject to judicial review. La.Const. art. 1, § 4(B)(4). Having found there is no valid federal constitutional question concerning the expropriation scheme set up under La.Const. art. 1, § 4, no question can be raised as to constitutionality of that state constitutional provision. *Fullilove v. United States Cas. Co. of New York*, 129 So.2d 816 (La.App. 2 Cir. 1961).

> [B]eing a constitutional provision, it removes from discussion or consideration any question as to whether it would violate any constitutional provisions or prohibitions, such as might have been the case if the amendment were a legislative enactment. Had it been a statute, then the question might have been posed whether it contravened . . . the Constitution. . . . Being a constitutional provision, which is the supreme law, it overrides the Legislature, and all decrees, ordinances, rules and regulations of creatures of the Constitution. Since it is a constitutional provision, no question can arise as to its constitutionality in a case such as this where no federal questions are involved and where no guarantees of the United States Constitution have been invaded.

*Id.* at 821.

Having found above that La.Const. art. 1, § 4 and La.R.S. 19:2–19:16 sufficiently protect due process and property rights of landowners under the federal Constitution, we cannot find that the Louisiana expropriation regime violates the very constitution that first established that framework. Defendants' assignment of error is without merit.

17

**Public and Necessary Purpose: Evidentiary Issues**

Next, Defendants claim that the trial court erred in allowing what they allege was impermissible evidence concerning economic development in the determination of whether the pipeline served a public and necessary purpose, a prerequisite to BBP's expropriation action as a private company. In addition, Defendants further contend that the trial court erred when it determined the public and necessary prerequisite without allowing them to present their evidence concerning various adverse impacts of the pipeline.

Louisiana Code of Evidence Article 103 provides, in pertinent part:

A. Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) Ruling admitting evidence. When the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection; or

(2) Ruling excluding evidence. When the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel.

The trial court is vested with vast discretion in connection with the admissibility of evidence. *Bridgers v. Southwest Louisiana Hosp. Ass'n*, 99-520 (La.App. 3 Cir. 11/3/99), 746 So.2d 731, *writ denied*, 99-3402 (La. 2/18/00), 754 So.2d 965. It will not be reversed absent an abuse of that discretion. *Maddox v. Omni Drilling Corp.*, 96-1673 (La.App. 3 Cir. 8/6/97), 698 So.2d 1022, *writs denied*, 97-2766, 97-2767 (La. 1/30/98), 709 So.2d 706.

Prior to trial, Defendants filed a motion *in limine*, seeking to exclude evidence BBP intended to offer of economic benefits of oil and petroleum products generally. In ruling in Defendants' favor, the trial court stated, "I will not consider any tax revenue or economic development, but I will allow [BBP] to present evidence of the

public benefit and the public purpose." During trial, David Dismukes, BBP's expert economist with expertise in the area of energy infrastructure and development and regional economic impacts, testified about three particulars, namely: (1) whether the increased diversity of supply of crude oil as a result of the pipeline would lower consumer prices; (2) how greater crude oil transportation alternatives increase Louisiana refinery competitiveness; and (3) how pipelines create new consumer opportunities.

From the outset, our reading of the record shows Defendants failed to object to Dismukes's testimony about the second and third items noted above. As reiterated in *Williams v. SIF Consultants of Louisiana, Inc.*, 13–972, p. 9 (La.App. 3 Cir. 2/26/14), 133 So.3d 707, 715:

> "The general rule is that a rule of evidence not invoked is waived, and, hence, a failure to object to evidence waives the objection to its admissibility." *Ratcliff v. Normand*, 01-1658, pp. 6–7 (La.App. 3 Cir. 6/5/02), 819 So.2d 434, 439. "To preserve an evidentiary issue for appellate review, it is essential that the complaining party enter a contemporaneous objection to the evidence or testimony, and state the reasons for the objection." *LaHaye v. Allstate Ins. Co.*, 570 So.2d 460, 466 (La.App. 3 Cir.1990), *writ denied*, 575 So.2d 391 (La.1991) (citing *Pitts v. Bailes*, 551 So.2d 1363 (La.App. 3 Cir.), *writs denied*, 553 So.2d 860 (La.1989), 556 So.2d 1262 (La.1990)).

Defendants' failure to timely object to those two particular items of evidence constitutes a waiver to their admissibility.

As to Defendants' objection to Dismukes's testimony regarding the effect of the pipeline on consumer prices, the trial court denied Defendants' objection. In doing so, the trial court stated, "That's not the economic impact to the state. It's a public benefit, so I'm going to allow it."

Louisiana Constitution Article 1, § 4(B)(3) states: "Neither economic development, enhancement of tax revenue, or any incidental benefit to the public

shall be considered in determining whether the taking or damaging of property is for a public purpose pursuant to Subparagraph (1) of this Paragraph or Article VI, Section 23 of this Constitution." Defendants allege that the trial court allowed testimony they contend focused on economic development and incidental benefit to the public as prohibited by the Constitution. We disagree. Although La.Const. art. 1, § 4(B)(3) prohibits evidence of economic development in the assessment of "public purpose," it does not exclude evidence of the economic benefits of the proposed expropriation.

Moreover, even if the admission of this single item of evidence was erroneous, such error does not require a reversal of the trial court's determination that this project met the public purpose requirement for this expropriation. We observe that this testimony did not affect a substantial right of the Defendants; this is particularly so considering the other unobjected to testimony which related to the pipeline's public benefits.

Defendants next assert that the trial court found a public and necessary purpose for the pipeline without having any evidence concerning the actual shippers or customers of the pipeline. As the record reflects, the trial court sustained BBP's objection to this testimony, finding it not relevant to the public and necessary purpose issue before it.

From the outset, we observe that a long line of Louisiana cases has upheld transportation of oil via pipeline as serving a public purpose. *See Dixie Pipeline Co. v. Barry,* 227 So.2d 1, 7 (La.App. 3 Cir. 1969), *writ refused*, 255 La. 145, 229 So.2d 731 (1970), in which this court found a public purpose where a plant produced propane from the raw stream it received from area producers and where "the effect of the new line will be to transport large quantities of propane gas from the plant to

20

a large market in several states." Likewise, in *Louisiana Resources Co. v. Greene*, 406 So.2d 1360, 1364 (La.App. 3 Cir. 1981), *writ denied*, 412 So.2d 84 (La.1982), this court held that "[t]he public need not be supplied gas directly from the pipeline for which expropriation is sought for the expropriation to meet the test of public purpose." Rather, "[t]he pipeline serves a public purpose merely by placing more natural gas in the stream of commerce." *Id.*

Given the long line of cases finding a public and necessary purpose for oil pipelines, the Louisiana Supreme Court in *ExxonMobil Pipeline Co. v. Union Pac. R. Co.*, 09-1629, p. 11 (La. 3/16/10), 35 So.3d 192, 199 (quoting *Town of Vidalia v. Unopened Succession of Ruffin*, 95-580, p. 7 (La.App. 3 Cir. 10/4/95), 663 So.2d 315, 319), noted that "any allocation to a use resulting in advantages to the public at large will suffice to constitute a public purpose." In reaching this determination, even without identification of the end users to whom delivery of the petroleum products was made, the *ExxonMobil* court ruled that a public and necessary purpose for the oil pipeline existed. In light of this jurisprudence, we find the trial court did not abuse its discretion when it excluded Defendants' query into the shippers and customers.

Finally, we turn to Defendants' contention that the trial court erred when it failed to allow their evidence concerning allegedly adverse impacts of the pipeline. Their objection comes in two forms: (1) the trial court's refusal to allow them to question Dismukes about the negative impacts of pipelines; and (2) curtailing the testimony of Scott Eustis, their wetland's expert, about the negative environmental impact of pipelines in Louisiana.

As to Defendants' examination of Dismukes, the record reveals two aspects of this issue. Initially, the record shows the trial court allowed Defendants, at least

21

to a certain degree, to address Dismukes about the question of whether pipelines have an impact on the coastal land loss. However, the trial court disallowed Defendants pursuit of questioning as to the negative impact of pipelines, whether environmental or economic.

In *Clay v. Int'l Harvester Co.*, 95-1572 (La.App. 3 Cir. 5/8/96), 674 So.2d 398, this court recognized that whether expert testimony may be received, the witness must be qualified to express an expert opinion. As we examine this aspect, we find the trial court did not abuse its discretion. First, BBP tendered Dismukes as an expert economist, not an environmental expert. We feel the environmental impact was beyond the qualifications of Dismukes. Second, Defendants attempted to bypass Dismukes's expertise when they sought testimony from him in a manner which would have related environmental testimony to the issue of the economic detriment of the pipeline vis-à-vis possible environmental impact and coastal land loss to the state. In sustaining BBP's objection to this line of questioning, the trial court reminded Defendants that should it allow such testimony, which it was not precluding, such questioning would open the door for BBP to ask further questions about the economic benefit of the pipeline, a subject it had earlier disallowed in Defendants' pre-trial motion in limine. Ultimately, Defendants chose not to pursue its line of inquiry on the pipeline's potential economic detriment. Against that backdrop, we cannot say the trial court abused its discretion in making this evidentiary ruling.

Defendants next contend the trial court erred when it prevented their wetlands expert, Scott Eustis, from testifying about the negative environmental impact of pipelines in Louisiana and in limiting his testimony to the specific parcel of land at issue in this expropriation proceeding. We find this error has not been preserved for

appellate review. Contrary to the requirements of La.Code Evid. art. 103(A)(2) to specify what substance of the excluded testimony was excluded and made known to the trial court, Defendants, without any particularity, have only vaguely stated their objection to this ruling. Notwithstanding, our review of the record shows that the trial court allowed, often over BBP's objection, Mr. Eustis to testify extensively about the environmental impacts of the proposed pipeline. As such, we find Defendants have failed to show that the exclusion of any environmental harm testimony adversely affected their substantial rights as required by La.Code Evid. art. 103(A).

Defendants' assignment of error is without merit.

**Reconventional Demand**

Defendants next claim that the trial court erred in failing to render judgment on their claim for constitutional violations of their property and due process rights suffered when BBP wrongly began pipeline construction on their property. This Defendants contend was in contravention of the explicit language in La.R.S. 19:8(A)(3) which entitles the expropriating authority to possess the property *only* after a judgment of expropriation has been granted. They claim the trial court "mistakenly confus[ed]" their reconventional demands with the constitutional issues discussed above when awarding trespass damages.[13]

---

[13] In addressing this contention, we point out that Defendants went to great lengths in its pre-trial memorandum to advise the trial court that their reconventional demands were not to be considered as a claim for inverse condemnation. Defendants state: "An inverse condemnation proceeding would allow BBP to treat this violation as an inadvertent mix-up, or administrative error, and essentially back-date an expropriation judgment it has not yet obtained[.]" Defendants made no argument to the trial court or before this court that this matter should have been considered a claim for inverse condemnation. Rather, Defendants frame their reconventional demand as a claim against BBP "for violations of due process and the right to property under the United States and Louisiana constitutions" and that they suffered damage "resulting from the company's construction of the pipeline without full executable legal right to do so."

In opposition, BBP contends the trial court did not fail to render judgment on the Defendants' reconventional demand. To the contrary, BBP contends the trial court's award of $75.00 to each defendant as trespass damages, a sum beyond the amount of just compensation damages, constitutes the damages they now assert were overlooked by the trial court.

To determine the merits of these opposing arguments, we must first examine the meaning of the term "cause of action." In *Everything on Wheels Subaru, Inc. v. Subaru S., Inc.*, 616 So.2d 1234, 1238 (La.1993) (footnotes omitted), our supreme court stated:

> In *Trahan v. Liberty Mutual Insurance Company,* 314 So.2d 350, 353 (La.1975), this court defined cause of action as "an act by a defendant which gives a plaintiff a right to invoke judicial interference on his behalf." The court pointed out the difference between a demand, which is "the object of the suit," and a cause of action, which is "the state of facts which gives a party a right to judicially assert an action against the defendant." Thus, cause of action . . . means the operative facts which give rise to the plaintiff's right to judicially assert the action against the defendant.

A trespass is an unlawful physical invasion of the property or possession of another person. *Davis v. Culpepper*, 34,736 (La.App. 2 Cir. 7/11/01), 794 So.2d 68, *writ denied*, 01-2573 (La. 12/14/01), 804 So.2d 646. A trespasser is one who goes upon another's property without his consent. *Id.*

With regard to due process, it has long been established that "one may not be deprived of his rights, neither liberty nor property, without due process of law[.]" *Boddie v. Connecticut*, 401 U.S. 371, 375, 91 S. Ct. 780, 784 (1971). Both the Fourteenth Amendment to the United States Constitution and La.Const. art. 1, § 4 guarantee freedom from the deprivation of life, liberty, or property without due process of law, the crux of which is protection from arbitrary and unreasonable action. *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513 (1976). Likewise,

it is equally clear that "[p]rocedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259, 98 S.Ct. 1042, 1050 (1978).

More specifically, it has long been held that the due process clause "raises no impenetrable barrier to the taking of a person's possessions[.]" *Fuentes v. Shevin,* 407 U.S. 67, 81, 92 S.Ct. 1983, 1994 (1972). In *Carey*, 435 U.S. at 259-60 (footnotes omitted), the court stated:

> Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that "procedural due process rules are shaped by the risk of error inherent in the truth-finding process . . . ." *Mathews v. Eldridge*, 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976). Such rules "minimize substantively unfair or mistaken deprivations of" life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests. *Fuentes v. Shevin, supra*, 407 U.S., at 81, 92 S.Ct., at 1994.

Indeed, "a purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, as well as to minimize the risk of mistaken deprivations of protected interests." *Carey*, 435 U.S. at 262.

Due process does not appear in a vacuum. Earlier in this opinion, we addressed Louisiana's legislatively enacted expropriation scheme, including its notice requirements, and contrasted that to Texas's procedure which authorizes quick-taking prior to a formal hearing to determine the public necessity for the taking. We then concluded, "Louisiana's expropriation scheme allows for a judicial determination of whether the purpose of the taking is 'public and necessary' *prior* to the taking, rather than review of a taking after the fact, as in the Texas statutes above. La.Const. art. 1, § 4." When BBP consciously ordered construction to begin on this property prior to obtaining a judicial determination of the public and

necessary purpose for that taking, it not only trampled Defendants' due process rights as landowners, it eviscerated the constitutional protections laid out to specifically protect those property rights. Therefore, we find the trial court committed legal error[14] when it failed to compensate Defendants when BBP tread upon those constitutionally recognized rights.

Louisiana Civil Code Article 805 provides that the consent of all the co-owners is required for the lease, alienation, or encumbrance of the entire thing held in indivision. Louisiana Civil Code Article 804 provides that "[s]ubstantial alterations or improvements to the thing held in indivision may be undertaken only with the consent of all the co-owners." Louisiana Civil Code Article 801 further provides that "[t]he use and management of the thing held in indivision is determined by agreement of all the co-owners." Furthermore, La.R.S. 19:8(A)(3) provides that "the expropriating authority shall not be entitled to possession or ownership of the property until a final judgment has been rendered and payment has been made to the owner or paid into the registry of the Court except as may otherwise be stipulated by the parties."

In the present case, Kevin Taliaferro, BBP's corporate representative and the Director of Right of Way, testified that construction crews entered the Defendants' property in the beginning of June 2018. In July of that same year, Peter Aaslestad, one of the defendants, filed suit to enjoin BBP from continuing construction on the property. On July 27, 2018, after being met with this suit to enjoin its construction activities on the property, BBP instituted an action for expropriation against the

---

[14] "When a judgment is silent as to part of the relief requested, the judgment is deemed to have denied that relief." *Duhon v. Lafayette Consol. Gov't*, 05-657, p. 11 (La.App. 3 Cir. 12/30/05), 918 So.2d 1114, 1120 (citing *Guaranty Bank & Trust Co. of Alexandria, La. v. Carter*, 394 So.2d 701 (La.App. 3 Cir.), *writ denied*, 399 So.2d 599 (La.1981)).

26

defendants and numerous others with whom BBP had not negotiated a servitude or whose whereabouts could not be determined. In a stipulated judgment on Aaslestad's suit for injunction, BBP agreed to remain off the property as of September 10, 2018; as the trial court stated, "the pipeline on the property in question was substantially completed by the middle of September, 2018[.]" The final judgment of the trial court on BBP's expropriation suit was not signed until December 18, 2018.

BBP unquestionably and admittedly entered and disrupted Defendants' land prior to the grant of expropriation by the trial court, in contravention of both Defendants' property rights and the explicit provisions of La.R.S. 19:8(A)(3). Thus, the record shows BBP cleared trees and dug on the property for months prior to the actual grant of their servitude when it legally gained the legal right to enter and disturb the property. "[W]hen private parties have the unrestrained ability to decide whether another citizen's property rights can be restricted, any resulting deprivation happens without 'process of law.'" *Boersching*, 872 F.3d at 708.

Nevertheless, BBP would have us limit our award because Defendants were out-of-state residents who had an *incredibly* minor ownership interest in the property;[15] they had no contact with the land *at all*, save for one visit by two of the three Defendants to see the land just prior to trial and one Defendant had still never been to the land at issue at trial; and Defendants never paid taxes or tried to possess or maintain the property in any fashion. This we decline to do.

---

[15] In its reasons for judgment, the trial court noted that Defendant Theda Larson Wright had an ownership interest in the property of 0.0000994%. Defendants Peter and Katherine Aaslestad had ownership interests of 0.0005803% each.

27

"Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property." La.Const. art. 1, § 4. Moreover, La.Civ.Code art. 802 provides:

> Except as otherwise provided in Article 801,[16] a co-owner is entitled to use the thing held in indivision according to its destination, but he cannot prevent another co-owner from making such use of it. As against third persons, a co-owner has the right to use and enjoy the thing as if he were the sole owner.

As co-owners, Defendants' due process rights were individually viable and as against BBP, a third-party, each were entitled to be recognized regardless of their co-ownership interest or residence. *In accord,* Kenneth M. Murchison, *Local Government Law,* 53 La.L.Rev. 823, 850 (1993) (footnotes omitted) (stating "the right to exclude others has been recognized as an essential attribute of the ownership of immovable property. When the government physically invades (or authorizes third parties to invade) real estate, a taking occurs even if the financial impact is minimal."). Thus, regardless of BBP's assertions of limitation, each Defendant was entitled to assert their constitutionally guaranteed due process rights against BBP's expropriation action and contest BBP's right to such an expropriation. As such, the due process rights established and specifically recognized in La.Const. art. 1, § 4 existed to protect Defendants' property ownership rights, and BBP willfully, wantonly, and recklessly[17] violated those rights.

---

[16] Louisiana Civil Code Article 801, which is inapplicable here, provides that "[t]he use and management of the thing held in indivision is determined by agreement of all the co-owners."

[17] In *Cates v. Beauregard Elec. Coop., Inc.*, 316 So.2d 907, 916 (La.App. 3 Cir. 1975), *aff'd* 328 So.2d 367 (La.1976), the Louisiana supreme court stated:

> The terms 'willful', 'wanton', and 'reckless' have been applied to that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence. These terms apply to conduct which is still merely negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if harm was intended. The usual meaning assigned to the terms is that the actor has intentionally done an act of

28

In the present case, the trial court's failure to award damages for BBP's violation of Defendants' due process rights, a claim separate and apart from their award for trespass damages, constituted legal error. When the trial court errs as a matter of law in its assessment of damages rather than abuses its "much discretion," an appellate court, if it can, must assess *res nova* the amount of damages appropriate under the circumstances. *Mart v. Hill*, 505 So.2d 1120, 1128 (La.1987).

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La.Civ.Code art. 2315. There is a general understanding that the purpose of a damage award is to restore the injured party, as closely as possible, to the position he occupied prior to the act which caused the damage. *Great American Surplus Lines Ins. Co. v. Bass,* 486 So.2d 789 (La.App. 1 Cir.), *writ denied,* 489 So.2d 245 (La.1986); *Langendorf v. Administrators of Tulane Educ. Fund,* 361 So.2d 905 (La.App. 4 Cir.), *writs denied,* 363 So.2d 1384 and 364 So.2d 120 (La.1978). However, as evidenced in the present case, no damage award for the violation of a due process right, one specifically guaranteed by our constitution and structured to protect owners of immovable property, can ever restore the injured party to their prior position. It is evident that any damage award must focus on the deprivational conduct of the party who violated those due process rights. In the present case, BBP's conduct clearly shows no fear of the consequences of trampling on property owner's constitutionally protected due process rights. Accordingly, any such damage award for these Defendants should be one which

unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow.

communicates to BBP that it did not "have the unrestrained ability to decide whether another citizen's property rights can be restricted" without due process of law. *Boersching*, 872 F.3d at 708.

Theda Larson Wright (hereafter "Ms. Wright") testified in no uncertain terms that she did not want any part of a pipeline going over her property "[b]ecause that bit of land means a lot to our family. I mean, we feel our roots are there." She further testified: "I was following a Facebook page and I saw the excavation and they had cleared the land and they were actually excavating. My sister and I were both very upset by that because we had not signed anything." Pushing on, her attorney queried, "When you say it's been stressing and you feel emotionally harmed, by what exactly?" Ms. Wright responded, "My family feels violated. You know, I was born in this country. I'm an American. I thought I had certain rights, and I don't feel those were respected."

Peter Aaslestad (hereafter "Mr. Aaslestad") testified: "I felt that I was being pulled into a conflict. You know, if I chose to stand up for my rights, that I'd be pulling into a conflict that would be even more distressing to me." He further explained that this was distressing to him "[b]ecause I'm a single individual and BBP is a billion-dollar company. Again, Energy Transfer Partners is a billion-dollar company. I felt I would not have the resources to fight for my rights." Likewise, when his attorney asked him what his expectations were when he filed to enjoin BBP's construction activities, Mr. Aaslestad stated:

> I had all sorts of scenarios going through my mind, but what I hoped for was that they would follow the law and exit the property and stop construction. I did not expect to learn that in the time between when I filed the injunction and there was an injunction hearing that they would complete the construction. That was probably the most upsetting. For me it's been a ramp up of stress. And the big jump up was on, I think it was the 10th or 11th of September when they signed papers saying, oh,

30

we agree not to enter the property, and it felt like a victory, only to learn that the reason that they're saying we won't enter the property is because they don't need to enter the property anymore except to do clean up under their idea. At that point I felt outsmarted. I felt defeated and terrified if I'm making the right decision to stick my neck out.

Katherine Aaslestad (hereafter "Ms. Aaslestad"), Mr. Aaslestad's sister, was asked by counsel how BBP's intrusion onto their property made her feel. She stated:

Well, it made me feel two things, off the top of my head. It made me feel, first of all, really depressed. Do property rights really not matter? We had been following this but we hadn't known there had been any kind—I was waiting for maybe some sort of determination that no, you don't matter, and we hadn't heard any of that. So I was really depressed that this could happen the way it's taken place without any kind of permission or any kind of resolution at the very least. So that was depressing. But I was also outraged because I believe very strongly in property rights. It's a key component of this country. It's a key component of every state I've ever lived in. It's a key component of Louisiana state law. It's a key component of the fricking Napoleonic code that came first.

In stark contrast to the Defendants' testimony, Mr. Taliaferro, BBP's director of rights-of-way, testified that although there were hundreds of landowners with a connection to the property who were named parties defendant in this expropriation, he nonetheless authorized construction to begin on this property even before expropriation proceedings began. On his authorization, construction began on this tract of land in the beginning of June 2018.[18] Under questioning from the trial court Mr. Taliaferro agreed with the trial court's statement that in pipeline construction "time is money."

After reviewing the record, we find the Defendants proved they are entitled to damages for BBP's violation of the due process rights particularized in this state's

---

[18] Scott Eustis, a wetlands expert with expertise in environment impacts, testified for the Defendants. Although he first saw no construction on this property when he made an airplane fly-over of this property in the Spring of 2018, he witnessed clearing of the property on June 26, 2018. On a later fly-over on August 30, 2018, he saw trenching and pipeline manipulation in a spoil bank on the property.

31

constitution. To decide otherwise would give entities such as BBP the unrestrained ability to decide whether another citizen's property rights can be restricted and makes a mockery of this state's carefully crafted laws of expropriation. Therefore, we award these Defendants each $10,000.00 for BBP's violation of their due process rights.

In addition, the Defendants have prayed for an award of reasonable attorney fees and expert witness fees. At the time BBP violated the Defendants' due process rights it acted as a private entity qualified as an agent of the government for purposes of La.R.S. 13:5111. *See Mongrue v. Monsanto Co.*, 249 F.3d 422 (5th Cir. 2001). As such, when it commenced pipeline construction on Defendants' property prior to the initiation of expropriation proceedings, it became liable to compensate Defendants for reasonable attorney fees and expert witness costs pursuant to the provisions of La.R.S. 13:5111. Because the record is incomplete with regard to these elements of costs, we remand this matter to the trial court for a hearing to determine those elements of cost.

**Prematurity**

Defendants next claim that the trial court erred in denying their dilatory exceptions of prematurity, alleging that BBP failed to comply with the statutory notice requirements prior to beginning expropriation proceedings.

The dilatory exception of prematurity "questions whether the cause of action has matured to the point where it is ripe for judicial determination." *Williamson v. Hosp. Serv. Dist. No. 1 of Jefferson*, 04-451, p. 4 (La. 12/1/04), 888 So.2d 782, 785. "The burden of proving prematurity is on the exceptor." *Id*. "Prematurity is determined by the facts existing at the time suit is filed." *Sevier v. U.S. Fid. & Guar. Co.*, 497 So.2d 1380, 1382 (La.1986). We review a denial of an exception of

prematurity under the manifest error standard. *In re C.E.B.*, 14-428 (La.App. 3 Cir. 12/3/14), 161 So.3d 811, *writ denied*, 15-002 (La. 1/23/15), 159 So.3d 1060; *Jefferson Door Co. v. Cragmar Const., L.L.C.*, 11-1122 (La.App. 4 Cir. 1/25/12), 81 So.3d 1001, *writ denied*, 12-454 (La. 4/13/12), 85 So.3d 1250. Louisiana Revised Statutes 19:2 provides, in pertinent part:

> Prior to filing an expropriation suit, an expropriating authority shall attempt in good faith to reach an agreement as to compensation with the owner of the property sought to be taken and comply with all of the requirements of R.S. 19:2.2. If unable to reach an agreement with the owner as to compensation, any of the following may expropriate needed property:
>
> . . . .
>
> (5) Any domestic or foreign corporation, limited liability company, or other legal entity created for, or engaged in, the piping and marketing of natural gas for the purpose of supplying the public with natural gas as a common carrier or contract carrier or any domestic or foreign corporation, limited liability company, or other legal entity which is or will be a natural gas company or an intrastate natural gas transporter as defined by federal or state law, composed entirely of such entities or composed of the wholly owned subsidiaries of such entities. As used in this Paragraph, "contract carrier" means any legal entity that transports natural gas for compensation or hire pursuant to special contract or agreement with unaffiliated third parties.

Louisiana Revised Statutes 19:2.2 provides, in pertinent part:

> A. Before exercising the rights of expropriation provided by R.S. 19:2, any expropriating authority referred to in R.S. 19:2 shall comply with the following:
>
> (1) Provide the owner whose property is to be taken with the following information from its appraisal or evaluation as to the amount of compensation due the owner for the full extent of his loss:
>
> (a) The name, address, and qualifications of the person or persons preparing the appraisal or evaluation.
>
> (b) The amount of compensation estimated in the appraisal or evaluation.
>
> (c) A description of the methodology used in the appraisal or evaluation.

(2) Offer to compensate the owner a specific amount not less than the lowest appraisal or evaluation.

B. Not more than thirty days after making an offer to acquire an interest in property, if no agreement has been reached with the property owner, each expropriating authority identified in R.S. 19.2, other than the state or its political corporations or subdivisions, shall provide to the property owner a notice that includes all of the following:

(1) A statement that the property owner is entitled to receive just compensation for the property to be acquired to the fullest extent allowed by law.

(2) A statement that the property may be expropriated only by an authority authorized by law to do so.

(3) A statement that the property owner is entitled to receive from the expropriating authority a written appraisal or evaluation of the amount of compensation due.

(4) A statement identifying the website of the expropriating authority where the property owner can read the expropriation statutes upon which the expropriating authority relies or a copy of the expropriation statutes upon which the expropriating authority relies.

(5) A statement offering to provide upon request of the property owner a copy of the expropriation statutes upon which the expropriating authority relies.

(6) A statement identifying an agency responsible for regulating the expropriating authority, including the name, website, and telephone number of the agency.

(7) A statement that the property owner may hire an agent or attorney to negotiate with the expropriating authority and an attorney to represent the property owner in any legal proceedings involving the expropriation.

*Ms. Wright*

Ms. Wright claims that she was not "provided" with the appraisal information required by La.R.S. 19:2.2(A)(1), rendering BBP's expropriation action premature, despite the fact she was clearly sent the information.  We disagree.

Ms. Wright concedes that BBP sent the disputed appraisal information to her at her residence.  When the post office could not deliver the parcel containing the

information to a "secure location," it left her a notice of the attempted delivery, indicating it could be picked up at the post office. Tracking information for the parcel indicated that it remained at the post office, ready to be picked up by Ms. Wright, for weeks before being returned to BBP. The trial court held that BBP satisfied its requirements in sending the information.

Due Process cases have never required actual notice but require only efforts "be 'reasonably calculated' to apprise a party of the pendency of [an] action." *Dusenbery v. United States*, 534 U.S. 161, 170, 122 S. Ct. 694, 701 (2002). Notice mailed, but not actually received, has been held to be sufficient in Louisiana expropriation cases. *Thomas v. New Orleans Redevelopment Auth.*, 04-1964 (La.App. 4 Cir. 10/6/06), 942 So.2d 1163. We find that BBP made reasonable efforts in sending Ms. Wright the required information, as it sent the appraisal to an address where she had received both prior and subsequent mailings without issue. Further, it was Ms. Wright's own actions in failing to retrieve the parcel, despite knowing it was waiting for her, that caused notice to be difficult, if not impossible, for the particular information at issue. Under the particular facts of this case, we can find no manifest error in the trial court's determination that the information was provided as required, even though Ms. Wright did not receive it.

*Mr. Aaslestad*

Mr. Aaslestad claims that BBP failed to properly provide him with notice under La.R.S. 19:2.2(B), subsections (4)–(7), in particular. The parts of La.R.S. 19:2.2(B) at issue require that a property owner receive notice of the expropriating authority's website where the property owner can read the expropriation statutes, a statement offering to provide the property owner a copy of the expropriation statutes upon which the expropriating authority relies, a statement identifying an agency

responsible for regulating the expropriating authority, and a statement that the property owner may hire an agent or attorney to negotiate with the expropriating authority. Such notice is to be provided "[n]ot more than thirty days after making an offer to acquire an interest in property, if no agreement has been reached with the property owner." *Id*.

Louisiana Revised Statutes 19:2.2(B), as currently written, went into effect January 1, 2017. However, BBP made its initial offer to Mr. Aaslestad for the property in December 2016, prior to the law taking effect. If an act creates a new obligation where no such obligation existed before, the act is substantive. *River Cities Constr. Co., Inc. v. Barnard & Burk, Inc*., 444 So.2d 1260 (La.App. 1 Cir. 1983), *writs denied*, 446 So.2d 1223, 1226 (La.1984). In the absence of contrary legislative expression, substantive laws apply prospectively only. La.Civ.Code art. 6. "'Substantive laws,' for purposes of determining whether a law should be applied retroactively, are those which establish new rules, rights, and duties, or change existing ones." *Brown v. Schwegmann*, 07-210, p. 6 (La.App. 4 Cir. 7/30/08), 990 So.2d 1282, 1286. As the changes to La.R.S. 19:2.2 created new, additional obligations for BBP, we find they are to be applied prospectively only. Thus, the disputed information was not required to be given when the initial offer was made in 2016.

Additionally, we can find no error in the trial court's finding that the lack of said information did not prejudice Mr. Aaslestad. He was obviously aware of his right to retain counsel to negotiate or deal with BBP, as displayed by the current litigation. Said counsel was obviously well versed in the expropriation statutes at issue. Finally, when pressed at the hearing on the exception, Mr. Aaslestad could not identify any way in which he was prejudiced by the lack of the "missing"

36

information, or any way in which that information would have changed his defense of this case. The trial court did not commit manifest error in denying the exceptions of prematurity.

For the above reasons, the decision of the trial court is hereby affirmed, in part, and reversed, in part. IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Katherine Aaslestad, Peter Aaslestad, and Theda Larson Wright and against Bayou Bridge Pipeline, LLC, in the sum of $10,000.00 each, together with legal interest thereon, as well as attorney fees and expert witness costs to be determined by the trial court on remand.

**AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED FOR DETERMINATION OF ATTORNEY FEES, EXPERT WITNESS FEES, AND COURT COSTS.**

**BAYOU BRIDGE PIPELINE, LLC**

**VERSUS**

**38.00 ACRES, MORE OR LESS, LOCATED IN ST. MARTIN PARISH, ET AL.**

Ezell, J., dissents in part and assigns reasons.

I respectfully dissent from the majority opinion's finding that the trial court erred in not awarding Defendants damages for alleged violations of their due process rights by Bayou Bridge, suffered when Bayou Bridge wrongly entered their property. Rather, I believe that the damages suffered by Defendants for Bayou Bridge's improper entry onto their property were for trespass alone.

A trespass is an unlawful physical invasion of the property or possession of another person. *Davis v. Culpepper*, 34,736 (La.App. 2 Cir. 7/11/01), 794 So.2d 68, *writ denied*, 01-2573 (La. 12/14/01), 804 So.2d 646. A trespasser is one who goes upon another's property without his consent. *Id.* Bayou Bridge unquestionably and admittedly entered and disrupted Defendants' land prior to the grant of expropriation by the trial court. Bayou Bridge cleared trees and dug on the property for roughly five months prior to the actual grant of their servitude, when it legally gained the right to enter and disturb the property. However, contrary to Defendants' assertions, this violation was not an infringement of Defendants' due process or other constitutional rights. Rather, entry onto the property prior to gaining the right to do so constituted a trespass. As noted by the majority, the Louisiana procedure for expropriation is constitutional and Bayou Bridge followed that procedure, though obviously far later than it should have.

In brief, Defendants cite *Belgarde v. City of Natchitoches*, 156 So.2d 132 (La.App. 3 Cir. 1963), wherein the defendant municipality constructed three streets through a thirteen-acre tract owned by the plaintiff landowner without securing her consent and without instituting expropriation proceedings *at all*. Besides the fact that *Belgarde* involved a municipality that built on the plaintiff's land without *any* expropriation proceedings, unlike the case at hand, the court in *Belgarde* awarded damages specifically *for trespass*. That court noted that the plaintiff there testified she was angered by the municipality constructing the streets through her property in her absence and without her consent, much as the Defendants here. However, the *Belgarde* court stated that the "type of damages resulting from an illegal trespass onto a landowner's property is regarded under Louisiana jurisprudence as compensatory damages to which the landowner is entitled for the violation of a recognized property right *through the trespass*." *Id.* at 134 (emphasis added).

Likewise, Defendants cite *Williams v. City of Baton Rouge*, 98-1981, 98-2024, p. 9 (La. 4/13/99), 731 So.2d 240, 248, for the proposition that trespassers who act in bad faith are subject to "all the resultant damages under [La.Civ.Code art.] 2315." I do not disagree with that premise, but feel that the facts of that case likewise bolster the trial court's decision to award trespass damages alone.

There, the City/Parish again failed to institute an expropriation proceeding all together, unlike Bayou Bridge here, then argued that its entry onto the landowners' property without permission did not result in a trespass, but only entitled the plaintiffs to inverse condemnation damages. The court there disagreed, stating:

> Because the City/Parish's action was unlawful, their entrance onto plaintiffs' land *constitutes a trespass* which resulted in damage to plaintiffs' property. "Justice, reason, and the principle of full reparation of La. C.C. art 2315 require that, where an individual's property is damaged unlawfully by a tortfeasor for no good reason, the owner be compensated at least as fully as when his property is damaged by the state for a public purpose." *Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co.*, 618 So.2d 874, 876 (La.1993). The landowner must be compensated not merely with the

> market value of property taken and severance damage to his remainder, but must be compensated to the full extent of his loss and placed in as good a position pecuniarily as he enjoyed prior to the taking. *Id.*; *State Through Dept. of Highways v. Constant*, 369 So.2d 699 (La.1979).

*Williams*, 731 So.2d at 249 (emphasis added). I agree with the court in *Williams* that unlawful entry onto another's property constitutes a trespass and that damages must follow. Here, Bayou Bridge admitted the trespass and the trial court awarded such damages.

The trial court awarded damages for that trespass based on thorough and sound reasons for judgment. Though the awards are indeed small, the trial court awarded minimal damages for trespass because Defendants were out-of-state residents who had an *incredibly* minor ownership interest in the property. In its reasons for judgment, the trial court noted that Defendant Theda Larson Wright had an ownership interest in the property of 0.0000994%. Defendants Peter and Katherine Aaslestad had ownership interests of 0.0005803% each.[1] Defendants had no contact with the land *at all*, save for one visit by two of the three Defendants to see the land just prior to trial. One Defendant had still never been to the land at issue at trial. Defendants never paid taxes or tried to possess or maintain the property in any fashion. Likewise, the trial court disregarded Defendants' claims of mental anguish due to lack of proof. Because Defendants have not appealed the amount of those trespass damages, those amounts are final.

Though I sympathize with Defendants' desire to discourage Bayou Bridge or other pipeline companies from entering property prior to actually having the right to do so, the amount of the trespass damages is not before this court in a manner in which we can alter them, as noted by the majority. I cannot find that the trial court erred in awarding damages for trespass only in this matter, where only damages for

---

[1] The unchallenged just compensation for the land alone was determined to be $0.09 for Mrs. Larson Wright and $0.51 for the Aaslestads. Including treble damages for timber, the total just compensation for the property was found to be $0.91 for Mrs. Larson Wright and $6.64 for the Aaslestads.

trespass were awarded in the cases cited by Defendants, especially considering the expropriating authorities in those cited cases did not undertake any expropriation proceedings whatsoever. Here, Bayou Bridge did eventually complete proper expropriation proceedings here, though far too late by their own admission.

While Defendants stress that the reasons Bayou Bridge entered their property was for financial gain and expediency, the reasons behind the trespass, even if committed in bad faith, do not change the nature of the violation. The violation Bayou Bridge committed is trespass alone, especially when Bayou Bridge did ultimately institute a proper expropriation action. Had Defendants actually appealed the amount of trespass damages, I would have no problem in increasing that award to discourage bad faith behavior as exhibited by Bayou Bridge here. However, I can not find a constitutional violation where I believe only trespass was committed in order to do so. I agree with the majority in all other respects.